# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION (CINCINNATI)

---------------------------------------------------------------X

SGIA RESIDENTIAL BRIDGE LOAN
VENTURE V LP,
    600 Travis Street
    6900 JPMorgan Chase Tower
    Houston, Texas 77002

Case No.: 1:20-cv-397

BRIDGE LOAN VENTURE V TRUST 2017-1,
    600 Travis Street
    6900 JPMorgan Chase Tower
    Houston, Texas 77002

Judge .:

              Plaintiffs,

           - against -

**VERIFIED COMPLAINT**

BUILD REALTY, INC. d/b/a GREENLEAF
FUNDING,
    9468 Towne Square Ave.
    Cincinnati, Ohio 45242

GREENLEAF SUPPORT SERVICES, LLC ,
    9468 Towne Square Ave.
    Cincinnati, Ohio 45242

QUEEN CITY FUNDING LLC,
    9468 Towne Square Ave.
    Cincinnati, Ohio 45242

GARY BAILEY,
    2716 Hyde Park Avenue
    Cincinnati, Ohio 45209

              Defendants.

---------------------------------------------------------------X

This is an action to recover more than $13 million stolen from Plaintiffs. Beginning in 2017, Plaintiffs SGIA Residential Bridge Loan Venture V LP ("SGIA Bridge Loan Fund") and Bridge Loan Venture V Trust 2017-1 ("Bridge Loan Trust") (collectively, "SGIA") entered into

1

various agreements with Defendants Greenleaf Support Services, LLC ("Greenleaf"), Build Realty, Inc. ("Build"), Queen City Funding LLC ("Queen City"), and Gary Bailey (collectively "Defendants"), whereby SGIA purchased selected mortgage loans from Build, and later Queen City, which are in the business of financing the purchase and renovation of residential properties. After SGIA purchased each selected loan from Build or Queen City, Build's affiliate Greenleaf serviced the loans.

Under the terms of the relevant mortgage loan subservicing agreement, Greenleaf was responsible for collecting principal and interest payments, managing the day-to-day interaction with borrowers and, after completion of a home renovation, assisting the borrower with sale of the property to a third party buyer. At closing for each property sale, the mortgage loan owned by SGIA was to be paid off and SGIA's first priority lien on the subject property was to be released. As subservicer, Greenleaf actively participated in these closings and was obligated to deposit sale proceeds sufficient to pay off each mortgage loan into SGIA's custodial account within two (2) business days and then wire those amounts to SGIA on the 20th calendar day of each month. SGIA was not aware of these closings nor did it participate in the closings.

Unbeknownst to SGIA, over 80 properties securing loans sold to SGIA have been sold since 2018. These sales were never disclosed on monthly remittance reports provided by Defendants to SGIA, nor have the vast majority of sale proceeds been remitted to SGIA. Moreover, Defendants intentionally hid these property sales from SGIA by claiming in monthly remittance reports that the subject loans remained active and borrowers continued to make interest payments and by paying SGIA the alleged interest payments from borrowers.

More than $13 million in sale proceeds have been wrongfully retained, in effect stolen, by Defendants. SGIA bring this action to recover these funds and other assets currently under

2

Defendants' control, and seek immediate injunctive relief to prevent any further dissipation of assets.

## Nature of the Case

1. SGIA asserts claims for breach of contract, replevin, conversion, unjust enrichment, civil theft, fraud, and seeks injunctive relief with respect to (a) proceeds received by Greenleaf as servicer and intended to pay off certain mortgage loans owned by SGIA, (collectively the "Sales Proceeds"); (b) mortgage loans and corresponding loan documents delivered to Defendants, as trustee, custodian, bailee and agent ("Loans"); and (c) interest payments paid to Defendants for any loans owned by Plaintiffs for which the secured property has not been sold ("Interest").

## The Parties

2. SGIA Bridge Loan Fund is a Delaware limited partnership with a principal place of business at 600 Travis Street, Houston, Texas 77002. None of SGIA Bridge Loan Funds' limited or general partners are citizens of the state of Ohio.

3. Bridge Loan Trust is a Delaware statutory business trust. The sole beneficiary of Bridge Loan Trust is SGIA Bridge Loan Fund.

4. Upon information and belief, Build is a corporation organized and existing under the laws of the State of Ohio with a principal place of business at 9468 Towne Square Ave., Cincinnati, Ohio 45242.

5. Upon information and belief, Greenleaf is an Ohio limited liability company with its principal place of business at 9468 Towne Square Ave., Cincinnati, Ohio 45242. Upon information and belief, Build is the sole member of Greenleaf.

6. Upon information and belief, Queen City is an Ohio limited liability company with its principal place of business at 9468 Towne Square Ave., Cincinnati, Ohio 45242. Upon information and belief, Gary Bailey is the sole member of Queen City.

7. Upon information and belief, Gary Bailey is a resident and domiciliary of 2716 Hyde Park Avenue, Cincinnati, Ohio 45209. Mr. Bailey is the President of Build and the Managing Executive Member of Queen City.

## Jurisdiction

8. This Court has original subject matter jurisdiction, pursuant to 28 U.S.C. § 1332, because the parties are of diverse citizenship and the amount in controversy is over $75,000, exclusive of interests and costs.

9. Venue is proper in the Southern District of Ohio because Build, Greenleaf, and Queen City have a substantial presence in this district and Mr. Bailey is a resident of this district.

## Facts Common to All Causes of Action

10. On April 27, 2017, SGIA Bridge Loan Fund, as buyer, and Build, as seller, entered into a Loan Purchase and Sale Agreement ("PSA I"). Pursuant to the PSA I, SGIA Bridge Loan Fund purchased certain Loans. (Exhibit 1.)

11. Pursuant to the PSA I, SGIA Bridge Loan Fund paid Build an aggregate sale price for the Loans and received all of Build's right, title and interest in and to the Loans, including all interest and principal payments made on the Loans. (*Id.* at ¶ 2.)

12. Upon payment of the aggregate sale price, Build was required to assign and convey each Loan to SGIA Bridge Loan Fund. Build was also required to deliver the executed notes and all supporting loan documentation, including but not limited to the mortgage and any other documents in Build's loan file for each Loan. (*Id.* ¶¶ 2, 4.)

13. Pursuant to the PSA I, Build made representations and warranties regarding the Loans, including but not limited to that each one of the Loans represented a valid first-priority lien on the related mortgaged property and that the mortgaged properties were free and clear of any encumbrances and mortgage liens that might have priority over the lien of the Loans. Build further represented and warranted that it would "perform all acts under this [PSA I], and will [] service the Loan[s] hereafter, in strict compliance with all Applicable Law." (*Id.* at ¶¶ 6, 7.)

14. On June 5, 2019, SGIA Bridge Loan Fund, as buyer, and Queen City, as seller, entered into a Loan Purchase and Sale Agreement ("PSA II"). Pursuant to the PSA II, SGIA Bridge Loan Fund purchased additional Loans from Queen City. (Exhibit 2.)

15. Pursuant to the PSA II, SGIA Bridge Loan Fund paid Queen City an aggregate sale price for the Loans and received all of Queen City's right, title and interest in and to the Loans, including all interest and principal payments made on the Loans. (*Id.* at ¶ 2.)

16. Upon payment of the aggregate sale price, Queen City was required to assign and convey each Loan to SGIA Bridge Loan Fund. Queen City was also required to deliver the executed notes and all supporting loan documentation, including but not limited to the mortgage and any other documents in Build's loan file for each Loan. (*Id.* at ¶¶ 2, 4.)

17. Pursuant to the PSA II, Queen City made multiple representations and warranties regarding the Loans, including that each one of the Loans represented a valid first-priority lien on the related mortgaged properties and that the mortgaged properties were free and clear of any encumbrances and mortgage liens that might have priority over the lien of the Loans. Queen City further represented and warranted that it would "perform all acts under this [PSA II], and will [] service the Loan[s] hereafter, in strict compliance with all Applicable Law." (*Id.* at ¶¶ 6, 7.)

18. Pursuant to the PSA I and the PSA II, Build agreed to provide a "Servicer Report" on the 12th calendar day of each month or the next Business day which was to include information such as the loan number, a description of the Loan, the date of the Loan, the Loan term, the Loan amount, the interest rate on the Loan, the Loan participation percentage, the Loan participation amount, the monthly interest on the Loan, the monthly servicing fees on the Loan, the payout due, and the next due date of the Loan. (Exhibits 1 and 2 at ¶ 1, Exh. C.)

19. The Loans purchased under the PSA I and the PSA II were to be subserviced by Greenleaf pursuant to a Flow Subservicing Agreement, dated April 27, 2017 ("Subservicing Agreement"). In the Subservicing Agreement, SGIA, as owners of and holders of a perfected security interest over the Loans, retained Greenleaf to, among other things, subservice and provide management and disposition services for the Loans. (Exhibit 3.)

20. Greenleaf retained, among other things, the original mortgage note with evidence of recording, the original assignment for each Loan, the original title insurance policy, and all additional documents generated as a result of or utilized in originating and or/servicing each Loan on behalf of SGIA. (*Id.* at § II.1.)

21. The Subservicing Agreement required Greenleaf to open a bank account (the "Custodial Account") to hold the Sales Proceeds. (*Id.* at § III.3.) The Custodial Account was to remain "separate and apart from any of [Greenleaf's] own funds and general assets." (*Id.*) Greenleaf agreed to deposit within two business days of receipt "all payments on account of principal on the [Loans], including all Principal Prepayments and all Prepayment Charges; all payments on account of interest on the [Loans], all Liquidation Proceeds…any amounts received from the seller of a [Loan] or any other person giving representations and warranties with respect to the [Loan], in connection with repurchase of any [Loan]…." (*Id.*)

22. Greenleaf was required to deposit all Sales Proceeds in the Custodial Account. (*Id*.) Upon information and belief, Greenleaf held certain Sales Proceeds in the Custodial Account.

23. Greenleaf was permitted to make withdrawals from the Custodial Account for limited purposes, including payments to owners and holders of a perfected security interest, for servicing fees incurred, fees due under the Subservicing Agreement, unreimbursed servicing advances, to transfer funds with the Owner's written consent, to withdraw funds deposited in error, and to clear the account upon termination of the Subservicing Agreement. Greenleaf was required to maintain on a Loan-by-Loan basis separate accounting for the purpose of justifying any withdrawal from the Custodial Account. (*Id*. at § III.4.)

24. Greenleaf agreed to provide monthly reports that included the delinquency status of each loan and the updated unpaid principal balance ("Remittance Reports").

25. Greenleaf was required to provide Remittance Reports in the form agreed to by the parties and to remit Sales Proceeds due to SGIA on the 20th calendar day of every month. If a Loan was paid in full, Greenleaf was required to notify SGIA in the monthly Remittance Report. (Exhibit 3 at §§ III.12, IV.1-IV.2.)

26. Greenleaf represented and warranted that it would service the Loans "in accordance with [] all requirements of federal, state, and local law." (*Id.* at § VI.1(j).) The Subservicing Agreement provides that any breach of representation and warranty remaining uncured for thirty (30) days after discovery of such breach or notice of the breach constitutes an event of default and requires Greenleaf to pay all costs associated with transferring servicing to a successor servicer appointed by SGIA. (*Id*. at § VI.2.)

27. The Subservicing Agreement allows SGIA to terminate the Subservicing Agreement for cause if there is "any failure by [Greenleaf] to remit to [SGIA] any payment required to be made under the terms of this Agreement which continues unremedied for a period of two (2) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to [Greenleaf] by [SGIA]." (*Id*. at § VIII.1(a)(i).)

28. Based upon its independent investigation, SGIA discovered that the collateral securing more than eighty Loans owned by them has been sold. Greenleaf hid these sales in its monthly remittances to SGIA, and never remitted the related Sales Proceeds to them. The estimated total Sales Proceeds that Defendants failed to report or pay over to SGIA exceeds $13 million.

29. To date, SGIA has identified 87 properties that secured Loans that were sold between March 23, 2018 and May 8, 2020 and never disclosed to SGIA. SGIA estimates that the unpaid principal balance on these 87 Loans is over $13 million. (*See* Schedule A.)

30. The 87 properties referenced above were reported on Greenleaf's most recent monthly Remittance Report, for the month of April 2020, as "current" loans, *i.e.*, performing Loans, or "delinquent" Loans, *i.e.*, non-performing loans. The April 2020 Remittance Report did not reflect any sale of the underlying collateral related to the 87 properties.

31. After an internal review of SGIA's holdings, on May 1, 2020, an SGIA representative e-mailed Mr. Bailey with a list of Loans SGIA had identified where the underlying collateral securing the Loans may have been sold. SGIA thereafter asked Mr. Bailey to explain what had happened to these Loans. (Exhibit 4.)

32. SGIA contacted Mr. Bailey again on May 6, 2020, May 7, 2020, and May 12, 2020, requesting that he provide additional information regarding the Sales Proceeds and

8

Greenleaf's failure to report or remit the same to SGIA. Mr. Bailey did not respond to SGIA's requests to discuss until May 12, 2020 at which point he stated to SGIA's representative that "[s]ome issues came to light as we were researching these loans. I called our attorney and he said it would probably be best for our counsels to connect." (*Id.*)

33. SGIA's counsel spoke to Mr. Bailey's counsel on May 12th and again on May 14th, at which time Mr. Bailey's attorney explained that the Defendants had been using Sales Proceeds to, among other things, (i) purchase additional properties that Defendants then re-sold to their customers as part of their ongoing business operations; and (ii) to "close out loans" which meant that when a borrower defaulted on a Loan, Defendants would take over the property, complete renovation of the property, and then sell the property to a third party, using Sales Proceeds to cover all of the associated costs.

34. Neither the PSA I nor the PSA II permitted Defendants to use Sales Proceeds for these purposes.

35. The Subservicing Agreement did not permit Defendants to use Sales Proceeds for these purposes.

36. In substance, Mr. Bailey's attorney acknowledged that Defendants had been stealing SGIA's money to fund Defendants' ongoing business operations. SGIA will be irreparably harmed if Defendants are permitted to continue this scheme.

37. On May 14, 2020, SGIA terminated the PSA I and provided notice of termination of the Subservicing Agreement in accordance with their terms. SGIA's notice of termination appointed Shellpoint Mortgage LLC as the successor servicer. Pursuant to Section VIII.1(a)(i) of the Subservicing Agreement, the notice further requested that Greenleaf deposit the Sales Proceeds into the Custodial Account within two business days.

38. Pursuant to Section VIII.1(a)(i) of the Subservicing Agreement, Greenleaf had two (2) business days following receipt of the notice to remedy the default, absent which the Subservicing Agreement would terminate of its own accord.

39. On May 15, 2020, SGIA terminated the PSA II.

40. SGIA terminated the Subservicing Agreement on May 18, 2020.

41. SGIA has fulfilled all of its obligations under the PSA I, the PSA II, and the Subservicing Agreement.

42. SGIA owns the Loans and maintains first priority security interests in the real property securing each Loan as well as the Sales Proceeds. None of the Defendants have either legal title to, or any equitable rights in, the Loans or Sales Proceeds.

43. To date, in response to SGIA's demands, it has received only $345,000.00, which does not appear to be related to the 87 properties that SGIA previously identified.

44. To date, Greenleaf has not transferred the Sales Proceeds to Plaintiffs and Greenleaf has failed to transfer servicing for the Loans identified on Schedule A.

## FIRST CAUSE OF ACTION
**(Breach of Contract)**

45. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

46. The Subservicing Agreement is a valid contract between Plaintiffs and Greenleaf.

47. The PSA I and the PSA II are valid contracts between SGIA Bridge Loan Fund and Build, and SGIA Bridge Loan Fund and Queen City, respectively.

48. Plaintiffs have performed their obligations under the Subservicing Agreement, the PSA I, and the PSA II.

49. Greenleaf has materially breached the Subservicing Agreement by failing to disclose the sale of collateral underlying the Loans, failing to disclose the existence of the Sales Proceeds, and wrongfully withholding the Sales Proceeds.

50. Greenleaf has materially breached the Subservicing Agreement by failing to remit all Sales Proceeds within two days of SGIA's May 14, 2020 written demand.

51. Build has materially breached the PSA I by failing to service the loans in compliance with applicable law as is required by Section 7.

52. Queen City has materially breached the PSA II by failing to service the loans in compliance with applicable law as is required by Section 7.

53. Defendants' material breaches have directly and proximately caused SGIA to incur damages in an amount to be determined at trial, but estimated to exceed $13 million. Absent injunctive relief, Plaintiffs will suffer irreparable harm.

## SECOND CAUSE OF ACTION
### (Replevin)

54. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

55. Plaintiffs own the Loans and have rights in and to the Sales Proceeds.

56. Plaintiffs have demanded that Defendants return the Loans, and pay over the Sales Proceeds to Plaintiffs.

57. Defendants have refused to return the Loans and the Sales Proceeds to Plaintiffs.

58. Accordingly, Plaintiffs are entitled to judgment directing Defendants to return the Loans, and pay over the Sales Proceeds to Plaintiffs.

59. Plaintiffs have no adequate remedy at law. Absent injunctive relief, Plaintiffs will suffer irreparable harm.

## THRID CAUSE OF ACTION
### (Conversion)

60. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

61. Plaintiffs own the Loans and owned the Loans at the time that the collateral underlying the Loans was sold.

62. Defendants have collected the Sales Proceeds but failed to disclose the related property sales to Plaintiffs and have improperly retained the Sales Proceeds.

63. Plaintiffs have lawful right and title to the Loans and the Sales Proceeds but Defendants have refused Plaintiffs' lawful demand to return the Loans and pay over the Sales Proceeds to them.

64. By reason of the foregoing, Defendants have directly and proximately caused Plaintiffs to incur damages in an amount to be determined at trial, but estimated to exceed $13 million. Absent injunctive relief, Plaintiffs will suffer irreparable harm.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

65. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

66. Defendants have wrongfully retained the Loans and Sales Proceeds, Plaintiffs' property pursuant to the PSA I, the PSA II, and the Subservicing Agreement.

67. Defendants have been unjustly enriched by their improper retention of the Loans and Sales Proceeds.

68. Plaintiffs have repeatedly demanded return of the Loans and Sales Proceeds.

69. Under the circumstances, equity and good conscience require that the Loans be returned to Plaintiffs. Absent injunctive relief, Plaintiffs will suffer irreparable harm.

## FIFTH CAUSE OF ACTION
### (Civil Theft)

70. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

71. Greenleaf was to service the Loans pursuant to the terms of the Subservicing Agreement.

72. The Loans are the property of Plaintiffs, as owners of the Loans.

73. Plaintiffs have demanded that Defendants return to Plaintiffs, as owners, the Loans and Sales Proceeds.

74. Defendants have failed and refused to return the Loans and Sales Proceeds to Plaintiffs.

75. Defendants have no legal or equitable right to hold or use the Loans and Sales Proceeds for any purpose whatsoever.

76. By retaining and refusing to return the Loans and Sales Proceeds, Defendants are knowingly retaining and using the property of the Plaintiffs with the intent to deprive Plaintiffs of their rights to benefit from the Loans and Sales Proceeds, and absent injunctive relief, Plaintiffs will suffer irreparable harm.

## SIXTH CAUSE OF ACTION
### (Fraud)

77. Plaintiffs repeat and reallege the allegations contained above, as if fully set forth herein.

78. Defendants were required under the parties' agreements to submit to Plaintiffs Remittance Reports that truthfully and accurately reflected, among other things, the status of Loans, including delinquency status of each Loan and the updated unpaid principal balance thereof, and any sales of the underlying real property collateral that secured the Loans.

79. On a regular basis over approximately the last twelve months, Defendants have submitted to Plaintiffs Remittance Reports that falsely represented that numerous Loans were "performing" when they were not, and failed to disclose the sale of real property collateral securing the Loans.

80. Plaintiffs justifiably relied on the Remittance Reports and believed them to contain true and accurate information regarding the Loans and underlying collateral insofar as Defendants had an obligation under the parties' agreements to provide true and accurate monthly Remittance Reports.

81. Defendants' false monthly Remittance Reports directly and proximately caused damage to Plaintiffs insofar as they, in reliance on the false representations, continued to believe that Loans as to which the underlying real property collateral securing the Loans had been sold were performing Loans, and were unaware that the sales of such collateral had generated Sales Proceeds to which Plaintiffs were entitled but which had been diverted by Defendants to their own unlawful use.

82. Defendants' wrongful actions prevented Plaintiffs from protecting their ownership interests in the Sales Proceeds generated by the sales of the underlying real property collateral securing Loans and allowed Defendants to divert such monies to themselves to the legal detriment of Plaintiffs.

83. Defendants' fraudulent representations have directly and proximately caused Plaintiffs to incur damages in an amount to be determined at trial, but estimated to exceed $13 million. Absent injunctive relief, Plaintiffs will suffer irreparable harm.

WHEREFORE, Plaintiffs respectfully request the following relief:

(a) granting a temporary restraining order and preliminary injunction, (i) restraining and enjoining Greenleaf, Build, Queen City, and Mr. Bailey, and all those affiliated or acting in concert with them, from selling, pledging, assigning, liquidating, encumbering, transferring, hypothecating, secreting, comingling or otherwise of all or any portion of the Loans, Sales Proceeds and Interest, pending a final judgment in this action; and (ii) to effect the immediate transfer of servicing for all of the Loans to Shellpoint Mortgage LLC, as successor subservicer;

(b) granting a permanent mandatory injunction compelling Greenleaf, Build, Queen City, and Mr. Bailey to turn over to Plaintiffs all of the Loans, Sales Proceeds and Interest;

(c) awarding Plaintiffs damages in an amount to be determined at trial, together with pre- and post-judgment interest and costs as allowed by law;

(d) awarding Plaintiffs attorneys' fees incurred in this action pursuant to Paragraph 13 of the PSA I and the PSA II and Section VI.4 of the Subservicing Agreement;

(e) granting such other and further relief as is just and proper.

Dated:  May 18, 2020								Respectfully Submitted,

FARUKI PLL

By: */s/ Jeffrey T. Cox*
	Jeffrey T. Cox (0055420)
	Trial Attorney
	Stephen A. Weigand (0083573)
	201 East Fifth Street, Suite 1420
	Cincinnati, OH 45202
	Telephone: (513) 632-0300
	 jcox@ficlaw.com
	 sweigand@ficlaw.com

	-and-

	Patrick L. Robson*
	Joseph J. Saltarelli*
	Jennifer L. Bloom*
	Sima Kazmir*
	HUNTON ANDREWS KURTH LLP
	200 Park Avenue
	New York, NY 10166
	(212) 309-1000
	probson@hunton.com
	jsaltarelli@hunton.com
	jbloom@hunton.com
	skazmir@hunton.com

*Attorneys for Plaintiffs SGIA Residential Bridge Loan Venture V LP and Bridge Loan Venture V Trust 2017-1*

*\*To be Admitted Pro Hac Vice*

## **VERIFICATION**

I, Brian Tortorella, pursuant to 28 U.S.C. § 1746 hereby verify that I am an authorized representative of Plaintiffs. I certify on personal knowledge that the allegations made in the Verified Complaint are true to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct. Executed on May 18, 2020.

*[signature]*
Brian Tortorella